Filed 4/17/23  P. v. Lopez CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ANDRES CAYETANO LOPEZ,<br><br>Defendant and Appellant. | F083388<br><br>(Kings Super. Ct. No. 20CMS-1928)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kings County.  Michael J. Reinhart, Judge.

David Y. Stanley, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Julie A. Hokans, and Clara M. Levers, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

Defendant and appellant Andres Cayetano Lopez (defendant) was convicted by jury trial of rape of his spouse by force, duress or fear of bodily injury; kidnapping; criminal threats; dissuading a witness by threat or force; and inducing a person by force, threat or fraud to give false testimony. On appeal, defendant contends his conviction of dissuading a witness by threat or force must be reversed on grounds the trial court committed instructional error and he was prejudiced thereby. We affirm the judgment of conviction.

## PROCEDURAL SUMMARY

On May 18, 2020, the Kings County District Attorney (D.A.)[1] charged defendant, by information, with kidnapping for the purpose of committing rape (former Pen. Code § 209, subd. (b)(1); count 1);[2] spousal rape (former § 262, subd. (a)(1); count 2); criminal threats (§ 422, subd. (a); count 3); and dissuading a witness by force or threat (§ 136.1, subd. (c)(1); count 4). The charges stemmed from incidents that occurred on or about April 4, 2020.

On May 20, 2020, defendant pleaded not guilty to all counts and denied the special allegation.

On July 8, 2021, without objection, the D.A. filed a "First Amended Consolidated Information" (bold type and unnecessary capitalization omitted). The First Amended Consolidated Information realleged counts 1 through 4 as set forth in the original information and alleged three additional counts for incidents that occurred on or about September 18, 2020: intimidating a witness (§ 137, subd. (b); count 5); inducing false testimony (*id*. at subd. (c); count 6); and altering evidence (§ 141, subd. (a); count 7).

On August 30, 2021, the day of trial, the D.A. tendered a "Second Amended Consolidated Information" (bold type and unnecessary capitalization omitted). The D.A.

---

[1] We also refer to the Deputy District Attorney(s) that appeared in the case as the "D.A."

[2] All further statutory references are to the Penal Code unless otherwise noted.

2.

recited the proposed changes to the information. The Second Amended Consolidated Information was accepted for filing without objection. It contained no new charges, realleged counts 1 through 5, and dismissed counts 6 and 7. As to all counts, the Second Amended Consolidated Information included a special allegation pursuant to sections 1170.12, subdivisions (a) through (d), and 667, subdivisions (b) through (i) that defendant had "suffered a prior conviction of a serious or violent felony or juvenile adjudication" under section 136.1, subdivision (c)(1); and, as to counts 1 through 4, pursuant to section 667, subdivision (a)(1), that defendant had "suffered [a] prior conviction(s) of a serious felony" under section 136.1, subdivision (c)(1).[3] Defendant, through counsel, waived arraignment and entered pleas of not guilty to all charges and denied all allegations.

Trial commenced on August 30, 2021. In a bifurcated proceeding outside the presence of the jury, defendant admitted the special allegations against him, and the court accepted defendant's admission.

On September 2, 2021, a jury convicted defendant of four counts and a lesser included offense as to a fifth count. Specifically, the jury found defendant guilty of count 2, the sentence for which the court designated as the "principal term" under subdivision (a) of section 1170.1.[4] The jury found defendant not guilty of count 1 (kidnapping for the purpose of committing rape) but guilty of the lesser included offense of kidnapping (§ 207, subd. (a)). The jury found defendant guilty of the remaining

---

[3] The alleged prior conviction was in Kings County case No. 18CMS-4977.

[4] Subject to certain exceptions not applicable here, subdivision (a) of section 1170.1 provides, in part: "[W]hen any person is convicted of two or more felonies … and a consecutive term of imprisonment is imposed …, the aggregate term of imprisonment for all these conviction shall be the sum of the principal term, the subordinate term, and any additional term imposed for prior applicable enhancements for prior convictions, prior prison terms, and Section 12022.1. The principal term shall consist of the greatest term of imprisonment imposed by the court for any of the crimes, including any term imposed for applicable specific enhancements…." (§ 1170.1, subd. (a).)

3.

counts 3, 4, and 5. As to count 4, dissuading a witness, the jury found it true that defendant "used or threatened to use force in the commission" of the offense (§ 136.1, subd. (c)(1)).

On October 1, 2021, the trial court sentenced defendant. As to count 2, the court sentenced defendant to the midterm of 12 years and an additional five-year enhancement pursuant to section 667, subdivision (a)(1). As to count 1, the court sentenced defendant to one-third the midterm doubled for a consecutive term of three years four months. As to count 3, the court sentenced defendant to one-third the midterm doubled for a consecutive term of 16 months. As to count 4, the court sentenced defendant to one-third the midterm doubled for a consecutive term of two years. As to count 5, the court sentenced defendant to one-third the midterm doubled for a consecutive term of two years. In all, defendant was sentenced to a total term of 25 years eight months.

That same day, October 1, 2021, defendant timely filed a notice of appeal.

## FACTS

### I. The Subject Incidents

Defendant and Y.C. were husband and wife. Together they had three children. Prior to the events in question, defendant had been serving time in prison. He was released from prison on January 1, 2020.

The day after his release from prison, defendant spoke to Y.C. concerning their family, how things between them would work, and whether she would let him see the children. Y.C. allowed the defendant to see the children several times a week. Y.C. also met defendant without the children and the two of them had consensual sex on a number of occasions – the last time being in February of 2020, when Y.C. decided to finally end their relationship.[5]

---

[5] Y.C. testified that, although she continued to receive text messages from defendant and would occasionally respond, after she decided to end the relationship she did not see defendant again until near the end of March when she went to see him

4.

On April 4, 2020, Y.C. went to work at a local gas station/food mart. She drove to work in her father-in-law's van. The side and back windows of the van were tinted. When she got off work that evening, she got in the van and started driving home. A "weird feeling" came over her that she was being watched but she continued driving. Then, as she turned a corner, the feeling came over her again. Suddenly, she saw someone coming towards her from behind. She immediately became afraid and slammed on the brakes. She thought to herself she should get out of the car and start running. Then she heard defendant's voice.

Y.C. testified that she was "going crazy," and "started screaming and … yelling" at defendant. She noticed defendant was wearing blue rubber medical gloves. Defendant told her "to calm down, that it was him, [and] that he wanted to talk to [her]." She continued to be afraid and asked defendant why was he was hiding in the van? What did he want? And why was he scaring her? Defendant continued to try to get her to calm down.

Defendant explained that he had tried talking to Y.C. earlier, but she would not talk to him. He acknowledged she did not want to have anything to do with him, but he just wanted to talk. Y.C. responded, "[Y]ou think this is the way it's going to be different? You think this is a way I'm going to talk to you?" Defendant replied, "[T]his is the only way I can talk to you, just calm down[,] I want to talk to you."

Defendant began questioning Y.C. and demanding that she tell him "who it is." "[T]ell me who he is." "[Tell me] the person that you are talking to." "[Y]ou either tell me who it is – either he's going down or you are going down, so tell me who it is. It's either him or you." Y.C. continued to be afraid "because [defendant] ha[d] been a really violent person with [her]." Defendant kept repeating, "[I]t's either him or you" and kept demanding she tell him "who it is."

because he was threatening to kill himself. The next time she saw defendant was on April 4, 2020.

Defendant told Y.C. to turn left on Corcoran Street and to keep driving. She told him, "[N]o." She turned left on Corcoran Street but pulled over to the side. He demanded she tell him "who it is and where he lived at." Defendant told her to unlock her phone, but she refused and told him she would not give him her phone.

Defendant kept demanding Y.C. unlock her phone, and Y.C. kept refusing. He then started complaining that Y.C. never wrote to him in prison and accused her of not caring for him. Y.C. told defendant she did not want anything to do with him and accused him of cheating on her "so many times." The argument lasted approximately 20 minutes. During this time Y.C. said she "fear[ed] for [her] life," and thought he "was going to do something to [her]." She was praying and thinking she was not "going to go down without fighting."

Y.C. decided she would "try to convince [defendant] that … [she] was not talking to [any]body, … that he was wrong and that [she] wanted to be with him." She started telling defendant she "care[d] for him" and "wanted to be with him" and that she had even told their oldest son, A.L., that the family (including defendant) would be getting together to watch a movie. Defendant accused her of lying, but she said she "was going to do that because [she] wanted … to get things right with [him]" and "want[ed] to be with [him]." She suggested they pick up their children and go to defendant's mother's house to watch a movie.

Defendant continued to accuse Y.C. of lying to him and continued demanding she unlock her phone. Defendant said, "[I]f you are not talking to [any]body, the first person that I see on your phone or the first message or whatever, I'm going to go after that person." When asked why he would do that, defendant responded, "[T]onight – tonight I'm not going – I'm not going to go back, and if I do it's going to be for something."

Y.C. told defendant to "think about the kids," reminded him he just got out of prison, and told him "[t]he kids want to be with you." Defendant replied, "I don't care[. Y]ou should have thought about that before you were out doing all this … shit.

6.

Being a whore. Being with other guys. You were out partying. You didn't care about the kids. Now all of a sudden you care about the kids. What's going to happen to the kids? Well, you didn't care about the kids. So it's going to be on you. So unlock your phone and whoever it is, I'm going to go after that person."

Y.C. continued to try to calm defendant down and convince him that she "wanted to be with him, that everything was going to work out, [and] that [she] was going to try to take [an existing] restraining order away from him so [they] can be together." She told him he could move in with her and the children. She explained she "didn't … know what to say … [she] just wanted to get out of that situation."

Eventually, defendant relented and said, "[O]kay, let's go." Y.C. then started driving the van toward her house and defendant said, "[W]e're not going to go home." He directed her to park in an apartment parking lot. He again accused Y.C. of lying to him and said she was "never planning on going to see [him]." She continued to try to appease him, at which point defendant took out his own phone and called A.L. to ask if it was true that Y.C. had told him that the family (including defendant) was going to get together to watch a movie that night. A.L., unaware of the situation, replied "[N]o, … my mom never said that."

Upon hanging up with A.L., defendant was calm and told Y.C. "I knew you were lying to me." Y.C. protested that she was not lying. Y.C. was "really scared" and feared defendant would "do something to [her]." When asked what she did next, Y.C. stated, "I was just trying to keep myself alive so I went … towards him and I hug[ged] him." She continued to try to convince defendant that she wanted to be with him, but he insisted she was lying. He demanded she give him the car key and her phone, took off his rubber medical gloves, and exited the vehicle to urinate. Y.C. was considering her options and did not think she could run to get away from him. She was concerned he might be armed and so she remained in the van.

7.

When defendant returned to the vehicle, he told her, "I know after tonight I'm going to go back into prison, so I at least want to have sex with you one last time." He then proceeded to undress Y.C. Y.C. was "humiliated" and "didn't want to have sex with him. But [she] knew if she [didn't] do it[,] he was going to get mad." Y.C. "let him do whatever he wanted to do." After defendant was finished, Y.C. dressed herself, hugged defendant, and said they should go home.

As they drove to Y.C.'s home, defendant told her "he knew he was going to go back to prison, and … he knew [she] was going to call the cops, so he told [her] that even though if he went in there for a year, two years, three years, 20 years, he was going to find [her] and he was going to kill [her]." Upon hearing this testimony, the D.A. asked, "If you told the cops?" to which Y.C. responded, "If I told the cops. That I was not going to be able to hide away from him. That whatever – wherever I would go, he would find a way to find me." On cross-examination, Y.C. was asked, "When did [defendant] threaten you, at what point?" Y.C. responded, "When he told me that if I would call the cops he was going to look for me and wherever he found me he was going to kill me."

They arrived at Y.C.'s home. Y.C. told her oldest son, A.L., that she was tired and was going to take a shower and go to bed. After about five minutes, while Y.C. was showering, defendant entered and got in the shower with her.

After they finished showering, Y.C. went to lie down. A couple of minutes later, defendant came into the room and started rubbing lotion on her. She told him she was tired, and he left. Y.C. fell asleep.

Y.C. left the house the next day to go to work. When she arrived at work, a coworker asked if she was okay, and Y.C. said, "[N]o." She called a friend to pick her up because she did not feel well. She "called [her] boss and … told her [boss] that something had happened to her, that [she] couldn't talk about it, and that – not to fire [her], [she] didn't want to lose [her] job, just to understand that [she] was going through a rough time …."

8.

Y.C. did not return to her home for a couple of days after the incident. During those days, defendant texted Y.C. repeatedly. She summarized his texts to her the day after the incident, April 5, 2020, as follows: He asked her "to come back, not to leave the house"; the "kids should have been more important than that person [she] left for"; "that person was more important than [her] kids"; "please come back, I want to be with you, don't do this to me and to the kids"; and "I promise you I was not going to do nothing to you, I was not going to hurt you, I just wanted for you to tell me who he was, and my only intention was to hurt him, not you, and get it over with and go to jail. But my intention was never to hurt you, I would never hurt you again…. If I really wanted to hurt you, I could have done it …."; "[p]lease come back, don't leave your kids. Your kids are broken, they want to be with you." He then texted her that "he would leave the house …. That he [would] leave [her] alone. And then that he was sorry." Y.C. did not respond.

The following day, defendant continued texting Y.C., telling her "to come back. That everything was going to be different. That he forgave [her] for whatever [she] did. That he was never going to hurt [her] again, that everything was going to be good. That [they] were going to move on with the kids." He concluded his texts telling her "to go ahead and move on"; that "he would never forget 20 years that he spent with [her] and that he would just wish [her] the best and for [her] to be happy." Again, Y.C. did not respond.

At some point in the months that followed the incident, Y.C. found a series of letters from defendant to their son, A.L., in A.L.'s drawers. In one of the letters, defendant told his son to participate in a ruse against Y.C. to make her think that one of his associates had abducted A.L. as a means of influencing Y.C.'s testimony against defendant in his upcoming trial. On one side of a two-page letter, defendant instructed A.L.: "Just read don't text her this side!!!!!" It continued with the message defendant

9.

wanted A.L. to read to Y.C. to make her think it was from defendant's associates. It reads, in part:

> "[Y.C.] you know due to what [defendant] did for our father in prison we've decided to extend that courtesy to [A.L.], you'll notice he'll not attend trial, he'll stay with us until [defendant] calls us as soon as trial is over [and] he won. We're going to return the favor to [defendant and] not hurt [A.L.] in any way[.] [H]e'll be treated as our family until or unless you don't do what you're asked to do. [Y.C.] because we know what [defendant] is capable [and] willing to do for [A.L. and] for you[,] I'd ask you not to notify him of this. I'll explain when I see him. Also know [A.L.] won't be same location as his phone. If you track his phone he'll get hurt. We have police scanners on different cities to listen to police activity if you alert any PD he will get hurt. Our interest isn't to hurt anyone[.]"

The script for A.L. to use in speaking to his mother continued with the following text:

> "Please don't get me hurt[.] I'm safe right now…. Mom[,] just in case you don't do this[,] I love you[. T]ell [my younger brothers] I love them. If you talk to my dad tell him I tried to be there [and] I love him too. Also tell [M…] I'm sorry [and] I love her [and] to take care. Bye mom."

In another of the letters, defendant wrote A.L. and gave him the following instructions:

> "Ok …, here you go[.] Please do everything I ask ASAP[.] [¶] … [¶] (3) I need an alibi or someone saying they saw me on Union & Dome St[reet] around 8:15-8:30 p.m. on April 4th. [¶] (4) So beg 40, Sinaloa, Johnny …, or Jano …, let them know the cops don't have any evidence against me and I need help because I'm fighting. [¶] (A) If it's 40 tell him to say he was cruising [and] he saw me [and] offered me a ride, but I told him I was waiting for my wife. [¶] (B) If it's Sinaloa tell him to say he was headed home when he saw me [and] he stopped to ask me if I wanted to work on Monday April 6th, but I told [him] no because I was starting on Thursday. [¶] (C) If it's John[n]y have him say he was coming from Chalillos [and] saw me like at 8:15 [and] stopped to ask me if there was still going to be work in the cherry like I had told him a week or so prior, [and] I told him [what']s up. [¶] If its' Jano … have him say he was going towards his house after walking around [and] he just said [what']s up [and] asked what I was doing? I told him waiting for my wife. [¶] Tell them all to say I told them I was waiting for my wife and whoever you get

10.

to help just say you talked to whoever agrees [and] give me their [number and/]or address."

The letter continued:

"[A.L.] please get on the ball ASAP[.] I need for you to let your grandparents [and] [A …] know [what']s up[.] Remember [to] tell them I left the last time to go walk at 8:00–8:15 your grandma was in her room. Your grandpa was outside smoking. I left towards Skyline [and] I can't remember where [A …] was at but tell her to deny remembering anything negative they ask her about me. They don't have phone records[,] recordings or anything."

## II.      First Prior Incident

Y.C. was asked about, and recounted, a prior incident of domestic violence that occurred in 2014. Y.C. and defendant were leaving Tachi Palace Casino. Defendant had been drinking. They got into their car with defendant in the driver's seat. Defendant became irate when Y.C. responded to a question with the answer to a different question. Defendant was further angered when he learned that the place he wanted to eat at was no longer there. He said that "he was tired, that he had gotten to work and he had [taken] [Y.C.] to the Palace and he didn't even get to eat. And that where in the hell was he going to go eat." Y.C. suggested a restaurant, but defendant did not like the suggestion. She suggested they eat at home. Defendant responded, " '[Y]eah, it's going to be f[***]ing late and I'm already f[***]ing hungry, what the f[***] do you think.' " Y.C. responded there was nothing she could do about it.

Defendant "started arguing, he went off on" Y.C. saying he was "f[***]ing tired of all the bullshit, if [Y.C.] was with somebody else [she] wouldn't know what to do …." Y.C. asked what defendant wanted her to do? He responded, "[I]f it would have been somebody else, you would have a f[***]ing answer."

Y.C. testified, "So he's like you know what I'm f[***]ing tired of your f[***]ing shit, just f[***]ing get in the trunk. I was like what? And he goes, yeah, get in the f[***]ing trunk. I'm like … you are crazy. How am I going to – how am I going to get

11.

in the trunk?  He goes like yeah, you are going to f[***]ing get in the trunk if you don't want me to f[***]king start hitting you.  And I was like … how am I going to get in the trunk?  Well, you are going to get out and get in the f[***]ing trunk."

Defendant pulled over and told Y.C., "[D]o you want to do it by yourself or do you want me to kick your ass and get you in there?"  She complied.  Defendant resumed driving and started speeding, swerving, and braking.  After a while, defendant stopped, opened the trunk, and asked Y.C. if she was "going to f[***]ing start acting like a f[***]ing human being?"  Y.C. asked him "to stop already, and he was like no because you f[***]ing act like a f[***]ing animal, and that's what animals f[***]ing deserve.  So he said are you going to act like a f[***]ing adult and going to act right or are you going to keep on … acting like a f[***]ing animal."  Y.C. responded that she was "going to act right."  She got in the passenger's seat, and they continued on.

After about a mile, defendant started questioning Y.C.  He told her, "[Y]ou know what[,] you're never going to f[***]ing act like a f[***]ing person, get your f[***]ing ass in the back already."  She pleaded for him to stop.  She recounted the following:

> "So, he's like no f[***] that shit, you are never going to act like a f[***]ing person.  So he stops, he pulls over, and he goes like so are we going to do this the easy way or do you want to do this the hard way?  And I'm like come on … please don't do this shit to me.  He's like are you going to get out or do you want me to f[***]ing grab you by your f[***]ing hair and put you in the f[***]ing trunk?  So I got out from the car because I didn't want him to hit me, and I got in the trunk again.  [¶]  So again he starts speeding, he starts swerving until he got to town."

When they arrived at their house, defendant did not let Y.C. out of the trunk.  Instead, defendant, seeing Y.C.'s brother, threw the keys at him and told him his sister was in the trunk.  Her brother let her out.

Y.C.'s brother recalled the incident at trial and corroborated that at about 1:00 a.m., defendant knocked on his door and gave him the keys to the car and said,

12.

"[H]ere you go." Not knowing what had happened he went to the car and released Y.C. from the trunk of the car.

Y.C. did not report the incident to police until 2018.

### III.     Second Prior Incident

Y.C. was asked about another incident that occurred at the Tachi Palace Casino approximately three months later. Defendant was driving them both back from the casino. He became angry at the way Y.C. was responding to questions he was asking her and accused her of disrespecting him. He began to berate her and complain about how he pays the bills, and how he got her "f[***]ing papers because [she] was a wetback." The two argued the entire drive home.

After they arrived home, Y.C. left again to drive their babysitter (i.e., defendant's sister) home. The sister-in-law, recognizing Y.C. had been crying, asked Y.C. what had happened. Then, the sister-in-law called defendant's mother to tell her defendant was treating Y.C. poorly. Within five to 10 minutes, defendant arrived at the sister-in-law's house. The sister-in-law went to lock the door, but Y.C. warned her that defendant would get "more mad." They went to hide in a bedroom and barricaded the door. They heard defendant break through the back door. He tried to enter the bedroom where they were hiding as they pushed a dresser against the door. Defendant, got his hand through, grabbed Y.C. by the hair, and started twisting her neck.

Defendant gained entry and "went off on [Y.C.]" He told her she was "f[***]ing stupid, … that [she] was done," and "that that was going to be the last f[***]ing break [she] had." He dragged Y.C. by the hair from one room to another and started kicking and punching her. He ignored his sister's pleas to stop. When his sister tried to intervene, defendant told her to "stay the f[***] away or I'm going to f[***]ing kill you." Defendant told Y.C., "[T]his is going to be the last f[***]ing night of your f[***]ing life, I'm going to end your life right now," grabbed Y.C. by the hair again, and took her outside.

13.

Defendant forced Y.C. to get in their car and started driving. Y.C. testified as to what happened next.

> "[H]e starts driving … until he gets to Fresno Street. And he just started swinging on my face, on my arms, he was just punching me. He grabbed me from the head and he started slamming my hair [*sic*] in the dashboard. He was just hitting me. He was – just kept on punching me and punching me and punching me and slapping me. And saying that I was going to die, that I was going to die. And that I was f[***]ing worthless, that I was a f[***]ing piece of shit, that didn't deserve – that I deserve to f[***]ing die. That I was not a good mom to my kids. That people like me didn't deserve to be in this f[***]ing world. [¶] So he takes a left on Second Street, he starts speeding and he starts speeding and he just – he just kept on hitting me. He just kept on hitting me, telling me that I was going to die, that I was going to die."

Y.C. thought once he stopped, she would "start running as fast as [she could]." When he stopped, she took off her seatbelt and tried to open the door. Defendant grabbed her by the hair and told her, "You think you would be able to f[***]ing escape?" Defendant started speeding again, berating Y.C. as he drove.

As he was speeding, the passenger door (which had not closed all the way) started opening. Defendant then started saying, "[Y]ou want to get off? You want to get off?" and started pushing Y.C. out the door. He sped even faster and continued to push her toward the open door. He then resumed hitting and punching Y.C. Then his phone started ringing. It was his mother.

Defendant told his mother, "[T]his f[***]ing bitch deserves to f[***]ing die." When defendant hung up the phone, he told Y.C., "[J]ust look at the f[***]ing shit you have f[***]ing done, you f[***]ing bitch. Now my f[***]ing mom is all f[***]ing worried and you are not even f[***]ing worth it because you are a f[***]ing slut, you are a f[***]ing bitch, and you are not even f[***]ing worth being in this f[***]ing world." He continued, "[T]his night I'm going to f[***]ing end your life like a f[***]ing dog, I'm going to f[***]ing leave you right here and nobody is going to f[***]ing find you."

14.

Y.C. testified that she was bleeding from her mouth and her left eye. At that point, she "was just tired," and "gave in." "I told God to take care of my kids and to protect my kids and that if that was going to be my ending for it to be because I was not going to keep on fighting for my life, I was already tired." As with the prior incident, Y.C. did not report this incident to police until 2018.

## IV.    Third Prior Incident

On July 4, 2017, defendant and Y.C. got into an argument in their kitchen. Y.C.'s sister and nephew, and their dog, had previously been staying with defendant and Y.C. Defendant was complaining because the dog had made a mess. Y.C. told defendant he should have mentioned it to her sister. Defendant said, "[W]hy would I tell her, that's your sister." Y.C. said she would let her sister know. Defendant responded, "[W]hy are you going to tell her? She's not here no more and I'm telling you, the one that should be answering to me is you not her." Y.C. said, "[O]kay, she's not here no more … there's nothing I can do about it." She asked, "Do you want me to call her and tell her what you are saying?" Defendant slapped Y.C. in the face and told her, "[Y]ou are not listening to me that I'm saying that you are the one that should have fixed this, why do you have to tell your sister about this?"

Defendant grabbed Y.C. by the head and pushed her down towards the sink. He continued to berate Y.C. as he held her down. When A.L. entered the room, defendant released Y.C.

Y.C. reported the incident to the police the next day and defendant was arrested. A restraining order issued against defendant prohibiting him from returning to the house. Upon his release from jail, however, defendant returned to the house. Y.C. called 911 and defendant was arrested again. The jury in this matter was informed that the parties had stipulated "the People would produce documentary evidence … [d]efendant was

15.

convicted of a violation of … [s]ection 273, violating a restraining order on or about July 6[], 2017."[6]

Y.C. was subpoenaed in 2018 to testify at court concerning the July 4, 2017, incident. She was still living with defendant at the time. When defendant found out she had been subpoenaed, he said he did not want her testifying and wanted her to report that she could not come to court and that she had lied about the events of July 4, 2017. Y.C. refused and defendant told her she "better do something about it because you are not going to go, and you are not going to make me look stupid … and make me look bad because you know that I'm facing time." Y.C. continued to refuse.

Defendant became angry and told Y.C., "[W]ell, just watch – if you go, just watch what's going to happen to you. I'm going to f[***]ing kill you." When Y.C. asked why he was telling her that, he replied, "[I]t was your fault that I got – you know, that I hit you that day and then I'm having to pay for it, and I'm still paying for it because I have to go to [anger management] classes. I'm paying money, I'm losing money, and it's all your fault." He continued to tell her not to show up to court and stated, "[I]f you go and you testify against me, I'm going to look for you and wherever I find you I'm going to kill you." The jury was informed that the parties had stipulated "[d]efendant was convicted of a violation of … [section] 136.1 subdivision (c) subdivision (1), intimidating a witness by threat on or about September 25, 2018."

## V. Other Evidence

A Spanish language interpreter was called to the stand to translate text messages written in Spanish by defendant to Y.C. In the texts, defendant repeatedly asked Y.C. to

---

**6** According to Y.C., the defendant was first arrested on July 5, 2017, in connection with the July 4, 2017 incident and an emergency restraining order issued the same day as his arrest. Although it is unclear from Y.C.'s testimony whether defendant returned to the house that same day or another day, we presume from the parties' stipulation that he returned on July 6, 2017.

talk to him, professed his love for her, accused and criticized her for seeing another man, and assured her he would never hurt her again.

An investigator from the D.A.'s office was called to testify as, and was stipulated by the parties to be, an expert on domestic violence. Specifically, he was called to testify concerning "delayed reporting, why victims stay with an abuser, and the general relationship between a victim and an abuser."

A.L. was called to testify by defense counsel. His testimony largely consisted of his recollection that he saw nothing out of the ordinary when his mother and defendant came home the evening of April 4, 2020, and the following day.

Defense counsel also called a family friend of defendant and Y.C. to testify. Her testimony was brief and uneventful.

Defense counsel also called defendant's mother to testify. She testified that defendant came to live with her following his release from prison in January 2020; that during the period January 2020 to April of 2020, Y.C. would come to her house to visit defendant, spend time with him in his room, and the two would sometimes leave together. She last saw Y.C. at her house approximately one week prior to April 4, 2020. She did not like Y.C. coming to the house because of the restrictions defendant was under.

## DISCUSSION

On appeal, defendant contends the conviction of count 4, dissuading a witness by force or threat (§ 136.1, subd. (c)(1)), must be reversed because the court failed to "sua sponte … identify malice as an element of this offense and to define 'malice' as used in regard to this charged offense," citing *People v. Serrano* (2022) 77 Cal.App.5th 902, 909–910 (*Serrano*). Defendant contends the error was prejudicial.

The People contend that, even if defendant is correct as to the need for additional instruction, defendant was not prejudiced by the instructions given and any error was

17.

harmless; that *Serrano* does not apply retroactively to defendant's case; and that *Serrano* was incorrectly decided.

For reasons discussed below, we conclude the trial court did err in failing to instruct the jury on the malice element of the aggravated crime of dissuading a witness (§ 136.1, subd. (c)(1)), but that the error was harmless beyond a reasonable doubt.

## I.      Standard of Review

"The trial court has a sua sponte duty to instruct the jury on the essential elements of the charged offense.  [Citation.]  [Failure to do so] is, indeed, very serious constitutional error because it threatens the right to a jury trial that both the United States and California Constitutions guarantee.  [Citations.]  All criminal defendants have the right to 'a jury determination that the defendant is guilty of every element of the crime with which he is charged, beyond a reasonable doubt.' " (*People v. Merritt* (2017) 2 Cal.5th 819, 824 (*Merritt*).)

"Even absent a request, the trial court must instruct on the general principles of law applicable to the case.  [Citation.]  The general principles of law governing a case are those that are commonly connected with the facts adduced at trial and that are necessary for the jury's understanding of the case." (*People v. Young* (2005) 34 Cal.4th 1149, 1200.)

"The independent or de novo standard of review is applicable in assessing whether [jury] instructions correctly state the law." (*People v. Posey* (2004) 32 Cal.4th 193, 218.) "In reviewing a claim of error in jury instructions in a criminal case, this court must first consider the jury instructions as a whole to determine whether error has been committed. [Citations.]  We may not judge a single jury instruction in artificial isolation, but must view it in the context of the charge and the entire trial record." (*People v. Moore* (1996) 44 Cal.App.4th 1323, 1330–1331.)

18.

## II.    Section 136.1 – Dissuading a Witness or Victim

The crime of dissuading a victim by threat of force is set forth in section 136.1. Subdivision (b)(1) of that section defines the basic crime, and subdivision (c)(1) defines an aggravated form of the crime committed knowingly and maliciously.  These subdivisions read, in pertinent part, as follows:

> "(b)  Except as provided in subdivision (c), every person who attempts to prevent or dissuade another person who has been the victim of a crime or who is witness to a crime from doing any of the following is guilty of a public offense and shall be punished by imprisonment … for not more than one year … [¶]  (1) Making any report of that victimization to any peace officer or state or local law enforcement officer .…  [¶] … [¶] (3) Arresting or causing or seeking the arrest of any person in connection with that victimization.

> "(c)  Every person doing any of the acts described in subdivision (a) or (b) *knowingly and maliciously* under any one or more of the following circumstances, is guilty of a felony punishable by imprisonment in the state prison for two, three, or four years under any of the following circumstances:  [¶]  (1) Where the act is accompanied by force or by an express or implied threat of force or violence, upon a witness or victim or any third person .…"  (§ 136.1, subds. (b)(1) & (c)(1), italics added.)

A violation of subdivision (b)(1) of section 136.1, " 'does not require that the defendant act knowingly and maliciously.'  [Citations.]  Instead, to 'prove a violation of section 136.1, subdivision (b)(1), the prosecution must show (1) the defendant has attempted to prevent or dissuade a person (2) who is a victim or witness to a crime (3) from making any report of their victimization to any peace officer or other designated officials.'  [Citation.]  The prosecution must also prove the defendant specifically intended that his acts would prevent or dissuade the victim or witness from making the report."  (*People v. Cook* (2021) 59 Cal.App.5th 586, 590 (*Cook*).)

"Under section 136.1, subdivision (c), a violation of subdivision (b)(1) is subject to heightened penalties if the defendant acted 'knowingly and maliciously' and committed the offense under additional specified circumstances."  (*Cook, supra,*

59 Cal.App.5th at p. 590.) As such, " 'knowingly and maliciously' " are mens rea elements of the offense and a defendant is entitled to instructions that properly advise the jury on those elements. (*People v. Hallock* (1989) 208 Cal.App.3d 595, 610; *Merritt*, *supra*, 2 Cal.5th at p. 824.)

Section 136 defines "malice" for purposes of section 136.1, as follows: " 'Malice' means an intent to vex, annoy, harm, or injure in any way another person, or to thwart or interfere in any manner with the orderly administration of justice." (§ 136, subd. (1).)

### III.   Instructions Given

The trial court instructed the jury with CALCRIM No. 252. That instruction read, in part:

> "The following crimes require a specific intent or mental state: …
> Dissuading a Witness as charged in Count Four…. For you to find a person
> guilty of [this] crime[], that person must not only intentionally commit the
> prohibited act, but must do so with a specific intent and/or mental state.
> The act and the specific intent and/or mental state required are explained in
> the instruction for [the] crime."

The specific intent or mental state required for count four (i.e., malice) was not set forth in CALCRIM No. 252.

Regarding the basic crime defined by subdivision (b)(1) of section 136.1, the trial court instructed the jury using CALCRIM No. 2622. The instruction read, in relevant part:

> "The defendant is charged in Count Four with intimidating a witness
> in violation of Penal Code section 136.1. [¶] To prove that the defendant is
> guilty of this crime, the People must prove that: [¶] 1. The defendant
> prevented or discouraged [Y.C.] from making a report that she was a victim
> of a crime to a law enforcement agency; [¶] 2. [Y.C.] was a crime victim;
> [¶] AND [¶] 3. The defendant knew he was preventing or discouraging
> [Y.C.] from reporting victimization and/or causing the arrest and intended
> to do so."

20.

The element and definition of "malice" were not included in this jury instruction which was appropriate because malice is not an element of the basic crime described in subdivision (b)(1).

Conversely, malice is an element of the aggravated form of the crime defined by subdivision (c)(1) of section 136.1. Regarding this charge, the trial court instructed the jury using a modified version of CALCRIM No. 2623. The instruction read:

> "If you find the defendant guilty of intimidating a witness, you must then decide whether the People have proved the additional allegation that the defendant used or threatened to use force. [¶] To prove this allegation, the People must prove that: [¶] The defendant used force or threatened, either directly or indirectly, to use force or violence on the person or property of a victim. [¶] The People have the burden of proving this allegation beyond a reasonable doubt. If the People have not met this burden, you must find that this allegation has not been proved."

In so instructing the jury, the trial court modified CALCRIM No. 2623 by omitting the malice element and definition of malice. The trial court did not instruct the jury that, to find defendant guilty of subdivision (c)(1) of section 136.1, it must find "[t]he defendant acted maliciously," and that "[a] person acts *maliciously* when he or she unlawfully intends to annoy, harm, or injure someone else in any way, or intends to interfere in any way with the orderly administration of justice." (CALCRIM No. 2623; §§ 136, 136.1.)

## IV. Serrano

In *Serrano*, we held that providing the jury with the jury instruction set forth in CALCRIM No. 2622 was sufficient to satisfy the knowledge element required for a conviction under section 136.1, subdivision (c). (*Serrano*, *supra*, 77 Cal.App.5th at p. 911.) However, in *Serrano*, as here, the trial court also gave a jury instruction based on CALCRIM No. 2623 but failed to include an instruction that, in order to convict the defendant of the aggravated form of dissuading a witness under subdivision (c) of section 136.1, the jury must also find the crime was committed maliciously. (*Serrano*, at p. 912.) We held it was error for the court to fail to instruct the jury that malice was an

21.

element of the crime and to omit the definition of malice from the jury instructions. (*Id.* at pp. 912–913.)

Section 136.1, subdivision (c) *expressly* requires a finding of malice in order to convict a defendant under that provision. "It is clear from the language of the two subsections [(b)(1) and (c)(1)] that a felony violation of the statute under subdivision (c)(1) includes all the elements of a misdemeanor violation of subdivision (b)(1), plus the additional requirements that the act be done 'knowingly and maliciously' and that it be accompanied by force or by a threat of force or violence." (*People v. Brenner* (1992) 5 Cal.App.4th 335, 341.)

Consistent with our holding in *Serrano*, the Use Notes to CALCRIM No. 2623 provide, in relevant part: "As noted in the Bench Notes to CALCRIM No. 2622, the court will instruct the jury that knowledge and malice are elements of a violation of … section 136.1(a). If the court has given the malice element in CALCRIM No. 2622, the court may delete it here. *If the court has not already given this element and the defendant is charged under subdivision (c), the court must give the bracketed element requiring malice here.*" (Use Note to Judicial Council of Cal., Crim. Jury Instns. (2d ed. 2021) CALCRIM No. 2623, p. 566, italics added.)

The People argue, however, the term was omitted because "it was bracketed as optional in CALCRIM [No.] 2623" which the People impliedly contend means the term was unnecessary in this matter. Not so. As the above referenced Use Note explains, the malice instruction is only unnecessary if the instruction has already been given for a charged violation of subdivision (a) of section 136.1.

The People also contend that requiring the jury "to find beyond a reasonable doubt that appellant knowingly and intentionally dissuaded the victim from contacting law enforcement" was "sufficient instructional language" for violating subsection (c)(1) of section 136.1. We disagree.

22.

Knowingly and intentionally dissuading a victim from contacting law enforcement is a requirement for a misdemeanor violation of subdivision (b)(1) of section 136.1 which provides : "Except as provided in subdivision (c), every person who attempts to prevent or dissuade another person who has been the victim of a crime or who is witness to a crime from doing any of the following is guilty of a public offense … [¶] (1) Making any report of that victimization to [specified authorities]." It is insufficient, however, to meet the requirement of malice under subdivision (c)(1) of section 136.1 which requires the specific "intent to vex, annoy, harm, or injure in any way another person, or to thwart or interfere in any manner with the orderly administration of justice." (§ 136.1, subd. (b)(1); § 136.) If we were to accept the People's proposition that the mere act of "knowingly and intentionally dissuad[ing] a victim from contacting law enforcement" sufficiently instructs the jury on the element of malice, we would essentially be rewriting the statute to exclude the element of malice from subdivision (c) of section 136.1 which is not this court's province.

"[T]he language of the statute is clear and unambiguous. Section 136.1 expressly sets forth a malice element as part of a section 136.1, subdivision (a) violation and as part of a subdivision (c) violation, but the plain language of subdivision (b) contains no malice element. 'When language is included in one portion of a statute, its omission from a different portion addressing a similar subject suggests that the omission was purposeful.' " (*People v. Brackins* (2019) 37 Cal.App.5th 56, 66 (*Brackins*).)

Although it may often be the case depending on the facts, we are not prepared to say that knowingly and intentionally dissuading a victim from contacting the police *necessarily* equates to an intent to "annoy, harm, or injure [someone else] in any way" or an intent to "interfere in any manner with the orderly administration of justice." (§ 136.)

The People further base their argument on *People v. Wahidi* (2013) 222 Cal.App.4th 802 (*Wahidi*) in which the court determined the malice element was met where the defendant intended to prevent a witness from testifying in court because such

23.

an act "always interferes in some manner 'with the orderly administration of justice' ...." (*Id.* at p. 807.) As explained in *Serrano*, however, the issue in *Wahidi* was not whether the jury was properly instructed on the elements of the crime. The issue was whether substantial evidence existed to support the jury's finding that the malice element was met. (*Wahidi*, at p. 809.) The *Wahidi* court determined the act of preventing a witness from testifying was, itself, substantial evidence of an intent to interfere with the orderly administration of justice. (*Id.* at pp. 807–809.) The People argue the fact *Wahidi* was concerned with whether substantial evidence existed to support the defendant's conviction "is a distinction without a difference." Again, we disagree.

"When an appellant challenges the sufficiency of evidence supporting a jury's verdict, the reviewing court examines whether there is substantial evidence, considered as a whole, to permit a reasonable trier of fact to find the defendant guilty of the charged crime beyond a reasonable doubt." (*Cook, supra,* 59 Cal.App.5th at p. 589.) A reviewing court " ' " 'must accept logical inferences that the jury might have drawn from the circumstantial evidence. [Citation.]' [Citation.] 'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]' [Citation.] *Where the circumstances reasonably justify the trier of fact's findings, a reviewing court's conclusion the circumstances might also reasonably be reconciled with a contrary finding does not warrant the judgment's reversal.* [Citation.]" [Citation.]' " (*Id.* at p. 590, italics added.)

In *Serrano*, we noted that "[r]emoving an element from the jury's consideration is tantamount to a directed finding on the element and is prohibited." (*Serrano, supra,* 77 Cal.App.5th at p. 912; *People v. Flood* (1998) 18 Cal.4th 470, 491.) Whether the jury in *Wahidi* was permitted, based on the evidence before it, to find the defendant guilty of the aggravated form of dissuading a witness (§ 136.1, subd. (c)), is a far cry from a

determination that such a finding was *required* by the evidence. *Wahidi* did not consider whether the element of malice could be properly eliminated from the jury's consideration. "A case is not authority for a proposition not considered." (*People v. Hatt* (2018) 20 Cal.App.5th 321, 326.)

The folly in reading *Wahidi* as support for a broader proposition that anytime a defendant intentionally prevents or discourages a witness from testifying (or, as in this case, from reporting a crime), the malice element is met – is exemplified by a hypothetical example posed by the *Brackins* court. There, the court considered the hypothetical example of an "employer who intentionally prevented an employee from testifying at a proceeding" but who was "motivated by the desire to keep the employee at work rather than by a malicious desire to thwart the administration of justice or to vex or annoy the employee." (*Brackins*, *supra*, 37 Cal.App.5th at p. 67.) The *Brackins* court suggested the Legislature "may have wished to limit section 136.1, subdivision (a) offenses to those involving malice." (*Brackins*, at p. 67.) Thus, although the *effect* of the hypothetical employer's conduct might reasonably be said to have thwarted the administration of justice, the employer's *intent* was not malicious and therefore the malice element would not be met. It is a defendant's *intent*, and *not the effect* of the defendant's act, that determines whether the act was malicious. (§ 136.)

We conclude the trial court erred in not instructing the jury on the malice element of section 136.1, subdivision (c).

## V. Retroactive Application

The People contend *Serrano* is not retroactively applicable to defendant's case. They argue *Serrano* creates a new rule of law that is merely procedural and not substantive, and that "procedural rules are not retroactively effective to cases not yet final on appeal." The People's argument is not persuasive. *Serrano* merely employed well established rules of statutory interpretation. Thus, even if *Serrano* had not been previously decided by this court, we would conduct a similar analysis to that provided in

25.

*Serrano* and arrive at the same construction of section 136.1, subdivision (c). We need not rely on the retroactivity of *Serrano* for our holding today. Nevertheless, we briefly address the People's argument below.

"If [a judicial opinion] does not establish a new rule or standards, but only elucidates and enforces prior law, no question of retroactivity arises. [Citations.] Neither is there any issue of retroactivity when we … address an issue not previously presented to the courts. In all such cases the ordinary assumption of retrospective operation [citations] takes full effect." (*Donaldson v. Superior Court* (1983) 35 Cal.3d 24, 36–37 (*Donaldson*).)

" 'If a decision does *not* establish a new rule, "the decision simply becomes part of the body of case law of this state, and under ordinary principles of stare decisis applies in all cases not yet final…." [¶] 'An example which illustrates the type of decision that does not establish a new rule of law and therefore should be applied to all cases not yet final is one that gives "effect to a statutory rule that the courts had theretofore misconstrued .…" [Citation.]' " (*People v. Parras* (2007) 152 Cal.App.4th 219, 226–227 (*Parras*).)

The *Serrano* decision does not appear to meet the definition of a new rule or standard as set forth in *Donaldson* and *Parras*. The only basis for the People contending otherwise is their unsupported assertion that it "overturn[ed] a longstanding or widespread practice that lower courts had approved of." We have no basis upon which to accept this bald assertion. The People's only argument in support of the assertion is that "CALCRIM No. 2623 designated the word 'maliciously,' as optional." But, as the Use Notes indicate, it is only optional if the jury was already instructed on the malice element in connection with CALCRIM No. 2622. Here, the jury was not instructed with regard to the malice element in CALCRIM No. 2622.

The People also acknowledge there "was not prior precedent speaking to this issue." Our state Supreme Court has stated, there is no issue of retroactivity "when we …

26.

address an issue not previously presented to the courts." (*Donaldson*, *supra*, 35 Cal.3d at p. 37.) Even if we were to accept the People's representation that trial courts have had a "longstanding or widespread practice" of omitting malice as an element in jury instruction pertaining to subdivision (c) of section 136.1, the relevant holding in *Serrano* would still seem to fit within the exemplar provided in *Parras*, i.e., that a court decision has retroactive application when it " 'gives "effect to a statutory rule that the courts had theretofore misconstrued .…" [Citation.]' " (*Parras*, *supra*, 152 Cal.App.4th at pp. 226–227.)

Finally, the People seek to draw a distinction between new procedural rules and new substantive rules, contending that only the latter require retrospective application, citing *Teague v. Lane* (1989) 489 U.S. 288, 302–304 (*Teague*) and *In re Martinez* (2017) 3 Cal.5th 1216, 1222. However, the aforementioned principle is not as categorical as the People suggest. Even a procedural rule may be applied retroactively "if it is a 'watershed rule[] of criminal procedure' implicating the fundamental fairness and accuracy of the proceeding." (*In re Rayford* (2020) 50 Cal.App.5th 754, 772; *Teague*, *supra*, 489 U.S. at pp. 311–312; *People v. Trujeque* (2015) 61 Cal.4th 227, 250.) The holding in *Serrano*, i.e., that a jury must be instructed on the malice element and find that element met in order to convict a defendant under section 136.1, subdivision (c), "implicat[es] the fundamental fairness and accuracy of the proceeding." (*Serrano*, *supra*, 77 Cal.App.5th at pp. 911–912; *In re Rayford*, *supra*, 50 Cal.App.5th at p. 772; *Teague*, *supra*, 489 U.S. at pp. 311–312.) Although we might take issue with the People's characterization of *Serrano* as establishing only a procedural rule and not a substantive rule, the distinction is immaterial because under either characterization, retroactive application of *Serrano* is appropriate.

We conclude the trial court erred by failing to instruct the jury that a finding of malice was necessary for a conviction under section 136.1, subdivision (c). Moreover, because the term "malice" has a special definition for purposes of section 136.1 (§ 136),

the trial court erred by failing to define it for the jury.  (See *People v. Roberge* (2003) 29 Cal.4th 979, 988 [trial court has an obligation to instruct whenever a statutory term "has a technical meaning peculiar to the law or an area of law"].)

## VI.     Trial Court's Errors Were Harmless Beyond a Reasonable Doubt

Having determined the failure to instruct the jury on the malice element and definition were errors, we now consider whether the errors were prejudicial.

" '[T]he omission of one or more elements of a charged offense … is amenable to review for harmless error under the state and federal Constitutions ….'  ([*People v.*] *Mil* [2012] 53 Cal.4th [400,] 415 [*Mil*].)  'A trial court's failure to instruct the jury on all of the essential elements of the charged offense is reviewed for harmless error according to the standard set out in *Chapman v. California* (1967) 386 U.S. 18, 24 … (*Chapman*).'  [Citation.]  Under the *Chapman* standard, an error is prejudicial and requires reversal of the conviction unless it appears 'beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'  (*Chapman*, at p. 24.)  Accordingly, the error ' "will be deemed harmless only in unusual circumstances, such as where each element was undisputed, the defense was not prevented from contesting any [or all] of the omitted elements, *and* overwhelming evidence supports the omitted element." '  (*Merritt*, *supra*, 2 Cal.5th at p. 828, italics added.)  Alternatively stated, we must review the record to determine whether it contains evidence that could rationally lead to a contrary finding with respect to the omitted element.  (*Mil*, at p. 417.)"  (*People v. Jennings* (2019) 42 Cal.App.5th 664, 679; *Neder v. United States* (1999) 527 U.S. 1, 19 [same].)

Defendant contends the trial court's error was prejudicial because (1) "the jury's finding on count 1 indicates a likelihood they would not have found the element of malice in count 4 had they been properly instructed" – i.e., the jury rejected the People's theory that defendant kidnapped Y.C. for the purpose of raping her, and their conviction of him on the lesser included offense of kidnapping "was consistent with the evidence that his anger … was based on his belief she was seeing someone else and his threats that

28.

the someone else or [Y.C.] was going down if [Y.C.] did not tell him who the person was." "In other words, the primary threat conveyed" to Y.C. was he would harm her in the event she did not tell him the identity of the person defendant accused her of seeing; (2) this court cannot ascertain whether the jury convicted defendant of criminal threats based on the aforementioned threat or a threat in the event she contacted the police; and (3) the jury could have perceived the threat as an "empty threat" because defendant had threatened to kill Y.C. on prior incidents but did not do so. In his opening brief, defendant contends: "Only after [defendant and Y.C.] then drove to [a] parking lot and had sex did [defendant] threaten [Y.C.] in regard to calling the police …." Defendant contends he "did not threaten harm if she called the police but rather he said he knew she was going to call the police and after he went to prison he would find her and kill her."

A review of the trial transcript reveals the only evidence the jury could have based their conviction of defendant on charges of dissuading a witness from making a report to police was the testimony of Y.C. that "[defendant] knew he was going to go back to prison, and … that he knew I was going to call the cops, so he told me that even though if he went in there for a year, two years, three years, 20 years, he was going to find me and he was going to kill me;" that "[i]f I told the cops. That I was not going to be able to hide away from him. That whatever – wherever I would go, he would find a way to find me[]"; and that he threatened her "[w]hen he told me that if I would call the cops he was going to look for me and wherever he found me he was going to kill me."

As noted, in order to convict a defendant of the aggravated crime of dissuading a witness under subsection (c) of section 136.1, a jury must find that the defendant acted maliciously, i.e., with "an intent to vex, annoy, harm, or injure in any way another person, or to thwart or interfere in any manner with the orderly administration of justice." (§§ 136, subd. (1), 136.1, subd. (c).)

The evidence upon which the jury based its conviction under section 136.1, subdivision (c) could not rationally lead to a finding that the evidence did not

29.

demonstrate "an intent to vex, annoy, harm, or injure" Y.C. There is simply no other rational interpretation of the evidence. The evidence that defendant dissuaded Y.C. from reporting the incident to the police was undisputed. Defendant was not prevented in any way from contesting the evidence. And the evidence that defendant had malicious intent in warning Y.C. against reporting the incident to the police was sufficiently strong to support the element.

We conclude the trial court's error in failing to instruct the jury on the malice element necessary to the charge of dissuading a witness/victim under subdivision (c) of section 136.1 was harmless beyond a reasonable doubt.

## DISPOSITION

The judgment of conviction is affirmed.


POOCHIGIAN, Acting P. J.

WE CONCUR:


PEÑA, J.


DE SANTOS, J.

30.